Brendan Judge
Jennifer Critchley
CONNELL FOLEY LLP
85 Livingston Avenue
Roseland, New Jersey 07068
973-535-0500

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CONSERVATION FORCE, Robert VIDEN, Jr., Peter HEFFERAN, Craig DEAR, Vincent James SPINELLA, Richard NORDLING, GARDEN STATE TAXIDERMIST ASSOCIATION, and John JANELLI, d/b/a Janelli Taxidermy,<br><br>    Plaintiffs,<br><br>       v.<br><br>Christopher PORRINO, Acting Attorney General of the State of New Jersey, and Bob MARTIN, Commissioner of the New Jersey Department of Environmental Protection,<br><br>    Defendants. | Civ. No. 16-CV-_____<br><br><br>COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1.   This action challenges two New Jersey laws, referred to here as S977 and S978,[1] which seek to prohibit resident possession, import, export, and transport (among other things) of certain game animal parts and products in the State of New Jersey and in facilities owned or operated by the Port Authority of New York and New Jersey.   Specifically, the laws target and purport to make it illegal for residents and businesses to possess, import, export, and transport traditional

---

[1]   Signed into law as P.L. 2016, c. 6, and P.L. 2016, c. 7, respectively.   This Complaint challenges only S977, although it describes the negative effects of S978 as well.   S978 is not challenged in this Complaint because it is not yet effective and only becomes effective if the State of New York passes a similar law.

hunting trophies of African elephant, leopard, lion, and black and white rhinoceros (the "Big Four").

2.  S977 and S978 seek to disrupt licensed, regulated hunting of those game animals in Africa.  But the laws are misguided.  Licensed, regulated tourist safari hunting is an essential component of the conservation programs for elephant, leopard, lion, rhino, and many other species.  It generates the primary means and incentives to safeguard most wildlife habitat in Southern and Eastern Africa, where most of these species persist.  It funds most of the operations, including law enforcement, of the relevant range-state wildlife authorities.  It creates community incentives that reduce the threat of human-wildlife conflict and lead rural people to protect wildlife as assets.  And it sustains the three primary tiers of anti-poaching: government law enforcement, hunting operator anti-poaching, and community game scouts.

3.  The human population of sub-Saharan Africa has almost quadrupled since 1965.[2]  There is significant competition between humans and wildlife for space, and the species have a fraction of the habitat left on which to range.  Accordingly, the peaceful coexistence of people and wildlife is a government priority requiring management actions by range nations.  In Southern and Eastern Africa, safari hunting is a key component of these management plans and a tool to preserve habitat.  Hunting areas protect significantly more habitat in Southern and parts of Eastern Africa than the national parks.  For example, in Zambia and Zimbabwe, areas that allow hunting are over two-and-a-half times the size of the national parks.  In Tanzania, hunting areas are more than five times the size of the national parks.  Providing incentives to maintain this

---

[2]    The human population of sub-Saharan Africa has grown from approximately 257 million to 973 million at a rate of more than 278%. Comparatively, the U.S. population grew by ~64%.  The German population grew by ~6.5%. The World Bank, http://data.worldbank.org/indicator/SP.POP.TOTL/countries/BW?display=default.

habitat is one of the key benefits of licensed, regulated tourist safari hunting.[3]  And the incentives generated by hunting has helped to recover Big Four populations to historic levels in Namibia, South Africa, Zimbabwe, and other range nations.[4]

4.  Licensed, regulated hunting generates hundreds of millions of dollars in revenue including most of the operating budget funds for range state wildlife authorities.  It provides tens of thousands of jobs and hundreds of thousands of kilograms of game meat for protein-starved rural communities.  It produces most income for affected communities from sustainable use of wildlife.  The income is invested in projects: building and electrifying schools and clinics, digging water holes, purchasing heavy equipment and vehicles, paying school tuition and pensions, and more.  Benefits from safari hunting improve rural livelihoods and living standards, thus incentivize the people living alongside dangerous wildlife to conserve it instead of treating it as a threat and nuisance.

5.  Benefits from safari hunting cause communities to value and choose to use land for wildlife instead of livestock or agriculture, increasing protected areas significantly (*e.g.,* ~7% of the surface area of Tanzania and ~50,000 km$^2$ of land in Zimbabwe).  This is because communities receive a significant share of hunting fees.  For example, in Namibia, it is 100%; in Tanzania, it recently grew to 75% of permit fees and 70% of game fees; in Zimbabwe, it is 100% of fees in CAMPFIRE areas (typically broken down as 55% directly to villages, 41% to the

---

[3]  *E.g.,* IUCN, Briefing Paper, *Informing Decisions on Trophy Hunting* (April 2016), http://cmsdata.iucn.org/downloads/iucn_informingdecisionsontrophyhuntingv1.pdf.

[4]  *See, e.g.,* Zimbabwe Parks and Wildlife Management Authority, *Zimbabwe National Elephant Management Plan (2015-2020),* http://conservationaction.co.za/resources/reports/zimbabwe-national-elephant-management-plan-2015-2020/ ("it is unlikely that Zimbabwe held more about 4,000 elephants in 1900.  More than one hundred years later, in 2014, this number had increased twenty-fold to nearly 83,000 elephants"); Drs. R. Emslie & M. Knight, *Prince William Is Talking Sense – Trophy Hunting Is Crucial to Conservation* (Mar. 18, 2016), http://www.independent.co.uk/voices/        comment/prince-william-is-talking-sense-trophy-hunting-is-crucial-to-conservation-a6940506.html;        Save        the        Rhino        International,        *Trophy        Hunting,* https://www.savetherhino.org/assets/0001/7279/What_is_trophy_hunting.pdf.

3

district council for projects, and 4% to the national community association); and in Zambia, it is a 50-50 split with the wildlife authority.  Villages also typically receive voluntary contributions from hunting operators and clients including food, wheelchairs, recreational equipment, building materials, transport, etc.

6.   Revenue from licensed, regulated tourist safari hunting is the backbone of anti-poaching in Southern and Eastern Africa.  For example, in Tanzania hunting revenue funds approximately 80% of usual wildlife authority anti-poaching, and a similar percentage in Zimbabwe.  Hunting revenue funds anti-poaching teams equipped and run by individual operators, and community game scouts providing additional "boots on the ground."  All three primary tiers of anti-poaching (state wildlife authority, operators, and communities) are sustained by the user-pay, safari hunting conservation system – which it was designed to do.

7.   Southern and parts of Eastern Africa have excelled in sustainable use-based conservation, depending mainly on tourist safari hunting.  Successful safari hunting programs exist in the range nations that support and secure the largest populations of Cape buffalo, African elephant, leopard, lion, and rhino (the "Big Five"; "Big Four" refers to these species without Cape buffalo).  Big Five hunts in these countries are the highest priced and so provide the greatest revenue and benefits, by expert design, in cooperation with the endangered species programs of the U.S. Fish and Wildlife Service ("USFWS") through import permitting.

8.   The USFWS, the federal agency authorized to administer the Endangered Species Act (the "ESA"), has repeatedly acknowledged the benefits of licensed, regulated hunting for wildlife and habitat conservation.  In so doing, it has authorized the import of the Big Four through regulations and import permits (and permits are now required for all the Big Four).  For example:

> We continue to believe sport hunting [of elephant], as part of a sound management program, can provide benefits to the conservation of the species …

and disagree that there is little basis for this assertion.  Trophy hunting can generate funds to be used for conservation, including for habitat protection, population monitoring, wildlife management programs, and law enforcement efforts[5] …

In summary, if part of a scientifically based management program (including a scientifically based quota), trophy hunting of lions can provide direct benefits to the species and its habitat, both at the national and local levels.  Trophy hunting and the revenue generated from trophy hunting are tools that range countries use to facilitate maintaining habitat to sustain large ungulates and other lion prey, protecting habitat for lions, supporting the management of lion habitat, and protecting both lions and their prey base through anti-poaching efforts …

Revenue generated from scientifically based management programs can be used to build and maintain fences, provide security personnel with weapons and vehicles, provide resources for anti-poaching activities, and resources for habitat acquisition and management (Chardonnet et al. 2010, pp. 33–34; Newmark 2008, p. 321).  For example, trophy hunting revenue in the Savé Valley Conservancy in Zimbabwe has enabled $150,000–250,000 USD to be invested in anti-poaching activities, including the removal of wire-snares (Groom 2013, p. 5)[6]…

Here in North America, trophy game hunting has led to the restoration of the white-tailed deer, elk, moose and a number of other species.  As the [International Union for Conservation of Nature] IUCN and other international wildlife management and conservation organizations recognize, well-managed wildlife programs that include limited, sustainable sport hunting [of rhino] can and have provided significant long-term benefits to the populations of many species[7]…

9.  The ESA empowers the USFWS to authorize import and subsequent possession of federally listed species.  The USFWS has published extensive regulations authorizing the import of trophies of the Big Four, but only after the USFWS finds the hunting "enhances the survival

---

[5]   USFWS, Final Rule, *Revision of the Section 4(d) Rule for the African Elephant*, 81 Fed. Reg. 36388, 36393-94 (June 6, 2016).

[6]   USFWS, Final Rule, *Listing Two Lion Subspecies*, 80 Fed. Reg. 80000, 80018 (Dec. 23, 2015).

[7]   USFWS, *Questions & Answers for Black Rhino/USFWS Statement on Dallas Safari Club Auction* (Oct. 29, 2013), http://www.fws.gov/international/permits/black-rhino-import-permit.html#13.  The USFWS has made similar findings for other species such as straight-horned markhor and Canadian wood bison.  *See, e.g.,* USFWS, *Frequently Asked Questions*, *Straight-Horned Markhor*, https://www.fws.gov/home/feature/2014/pdf/MarkhorFAQs-fRuleFinal.pdf ("the revenue generated by hunters directly supports a community-based conservation program and has resulted in measurable improvements in straight-horned markhor populations.  Further, by setting criteria in the 4(d) rule that programs must also benefit the local community to be eligible, the Service is ensuring U.S. hunters are participating in conservation programs that truly benefit the species by providing economic incentives that promote community-based conservation of markhor …").

of the affected species." 16 U.S.C. 1539; *e.g.,* 50 C.F.R. § 17.32. Accordingly, under the ESA and implementing regulations, the USFWS must find, and repeatedly has found, that licensed, regulated tourist safari hunting benefits the species in a measurable way before it allows a Big Four trophy to be imported.

10. New Jersey impermissibly seeks to substitute its judgment for that of the USFWS. As their primary sponsor admitted, S977 and S978 target big game hunters. Despite the documented benefits of licensed and regulated hunting, as repeatedly confirmed by the USFWS, New Jersey purports to outlaw the possession, import, export, and transport of traditional trophies lawfully imported under federal regulations and federal permits. Enforcement of these laws will have far-reaching negative consequences for the specially-designed conservation strategies and plans for elephant, leopard, lion, and rhino. Fortunately for the species, enforcement of the laws is plainly void under the ESA's preemption clause, 16 U.S.C. § 1535(f), and violates 42 U.S.C. § 1983.

11. If the Court does not enjoin enforcement of S977, Plaintiffs and the conservation programs of range nations will suffer irreparable harm. Plaintiffs will be deprived of their ability to lawfully possess, import, export, and transport, among other things, lawfully-acquired traditional trophies of successful hunts. This bar will dis-incentivize them from bearing the cost and fees of safari hunting and conservation in Africa, where it is used as a tool for conservation by expert design. The Big Four will suffer as a result of reduced conservation funding and incentives, irreparably damaging Plaintiffs' interests in sustainable use-based conservation and maintained recovery of the Big Four.

12. Accordingly, Plaintiffs request a declaration that S977 is void as preempted by federal law and a preliminary and permanent injunction against enforcement of the laws.

## JURISDICTION AND VENUE

13. The Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), because the claims arise under § 6 of the ESA, 16 U.S.C. § 1535(f)), the U.S. Constitution, U.S. Const. art. VI, cl. 2, and 42 U.S.C. § 1983.

14. The Court may grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

15. Venue is proper in the District of New Jersey under 28 U.S.C. § 1391(b), as this action is brought in the judicial district in which the defendants reside and a substantial part of the events giving rise to these claims occurred.

## PARTIES

### A.  PLAINTIFFS

16. Plaintiff Conservation Force is non-profit 501(c)(3) public foundation formed for purposes of conserving wildlife and wild places and expanding sustainable use for its indispensable value to people and the natural world.  Conservation Force is a world leader in the application of user-pay, sustainable use programs to enhance the survival and recovery of ESA-listed game species and has established programs for the Big Four as well as markhor, Canadian wood bison, and other listed species.  At its core, Conservation Force's name illustrates the documented fact that sustainable use through licensed, regulated tourist safari hunting has been a crucial force for habitat preservation and wildlife recovery for over a century and remains so today.  Conservation Force's directors and officers are noted experts on ESA and Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES") issues. Conservation Force works closely with and represents range nation authorities and environmental ministries, including those protecting most habitat and most of the Big Four (*e.g.,* Namibia, South Africa, Tanzania, Zambia, Zimbabwe).  Conservation Force works closely with

7

and represents the safari hunting operators that provide anti-poaching, the international and national safari operator and guide associations that fund conservation programs and enforce codes of conduct, and the local communities who live alongside wildlife and benefit from sustainable use.  Conservation Force maintains its principal place of business in Louisiana.

17. Conservation Force's members share its interest in protecting habitat and supporting wildlife conservation through sustainable use, which generates operating revenue for wildlife management, anti-poaching funds, and incentives for rural people in Africa.  They are hunter-conservationists who engage in lawful sport-hunting around the world and seek to import trophies as mementoes.  Individual Plaintiffs Robert Viden, Peter Hefferan, Craig Dear, Vincent Spinella, Richard Nordling, and John Janelli are members of Conservation Force.  Conservation Force appears on its own behalf and on behalf of its members.

18. Plaintiff Robert Viden, Jr. is a New Jersey resident and a hunter, conservationist, and New Jersey business owner.  Mr. Viden has extensively safari hunted in Africa and just recently returned from a Cape buffalo hunt.  Mr. Viden has the present firm intent to bring his grandson to Africa in the short-term future to hunt the Big Four, but only if import of the expensive trophies are permitted into the State of New Jersey.  Mr. Viden owns and operates a retail sports store in New Jersey that is family-owned and operated since 1965 and specializes in firearms, archery products, and hunting supplies.  His customer market includes New Jersey big game hunters, including those who hunt the Big Four.  Mr. Viden sells firearms, ammunition, and archery equipment suitable for such hunting.  His experience safari hunting and firsthand knowledge of Africa enables him to better communicate with, appeal to, and serve his customers.  Mr. Viden's business will suffer a direct financial loss from enforcement of S977.  Worse, he

will lose business and personal relationships with life-long customers who will be discouraged from engaging in safari hunting of the Big Four.

19. Plaintiff Peter Hefferan is a New Jersey resident and hunter with the present firm intent to book a 2017 hunt in South Africa, to include leopard.  He has researched, discussed, and negotiated terms of the booking.  Due to enactment of S977, Mr. Hefferan is currently reconsidering if he should still book the trip and make expensive, non-refundable deposits, or cancel.  Mr. Hefferan will not bear the expense to take a leopard if he cannot import it home to New Jersey.

20. Plaintiff Craig Dear is a New Jersey resident and hunter with the present firm intent to hunt in Limpopo Province in South Africa in 2017.  Mr. Dear has previously hunted the Big Five, and would hunt a leopard if there was a suitable opportunity.  Mr. Dear's hunting partners will hunt the Big Five.  If Mr. Dear's hunting partners cannot import the trophies back into New Jersey, then they will not hunt.  Mr. Dear will cancel or postpone his 2017 plans until imports are permitted.

21. Plaintiff Vincent James Spinella is a New Jersey resident and big game hunter.  He has hunted in North American for approximately 52 years, and is planning his first African safari.  Mr. Spinella has the firm present intent to hunt elephant and Cape buffalo in South Africa in 2017, and the firm present intent to book this hunt in January 2017.  Mr. Spinella has dreamed of hunting in Africa for many years.  He has already prepared considerably for the hunt and will continue to do so.  Among other things, Mr. Spinella attended a multi-day course to develop his skills for hunting dangerous game.  He attended a hunting club convention to meet and research operators.  He had two large-caliber rifles (suitable only for Big Five hunting) and a pair of hunting boots all custom made.  Mr. Spinella looks forward to the opportunity to hunt in South

9

Africa and to import his first African elephant trophy.  However, he fears he will not be able to import and possess an elephant trophy because of S977.  Mr. Spinella will not incur the costs in time and additional money to hunt an elephant in South Africa if he cannot import the trophy.

22. Plaintiff Richard Nordling is a New Jersey resident and hunter.  He recently returned from a safari in Namibia (from June 1-18, including travel).  Mr. Nordling hunted with Jofie Lamprecht Safaris, a well-known operator who maintains community assistance and anti-poaching programs.[8]  Mr. Nordling intended to harvest a leopard during this trip on a permit issued by Namibia's Ministry of Environment and Tourism ("MET"), which alone cost $8,000. MET issues two permits a year for Waterberg National Park, the area where Mr. Nordling hunted, to control and generate revenue to conserve the growing leopard population.  Mr. Nordling had an import permit issued by the USFWS, issued pursuant to the CITES resolution authorizing an export/import quota for leopard, and a specific USFWS regulation.  Mr. Nordling booked this safari in November 2015 and paid in full by April 1, 2016, including travel. Although he knew S977 had passed, he went forward with the trip.  But he feared he would not be able to bring back a leopard trophy due to enactment and enforcement of S977.  Additionally, Mr. Nordling had contracted with a Pennsylvania business for taxidermy of the leopard, and feared he would not be able to obtain the trophy from the taxidermist.

23. Mr. Nordling's hunt was disrupted by extenuating circumstances and he did not harvest a leopard.  But due to these circumstances, he expects to receive another license from MET, and has the present firm intent to return to Namibia in 2017 to repeat the safari and harvest a leopard. Mr. Nordling fears he will not be able to import this leopard into New Jersey, even with a valid USFWS permit.  Mr. Nordling greatly values the experience of hunting leopard in one of the most beautiful countries in the world, and in a country where he knows his fees are used for

---

[8]   *E.g.*, Jofie Lamprecht Safaris, Community Outreach Website, http://jlsafaris.com/social-upliftment-projects/.

community assistance, anti-poaching, and responsible game management. Mr. Nordling's second hunt will be even more important to him because his first hunt was disrupted. Mr. Nordling is irreparably injured by New Jersey's ban on possession, import, and transport of Big Four trophies, including leopard, because it diminishes his enjoyment of the hunt and eliminates his ability to import and possess a traditional leopard trophy.

24. Plaintiff John Janelli d/b/a Janelli Taxidermy is a New Jersey resident and taxidermist. Mr. Janelli is a long-standing member of Conservation Force and project leader. Mr. Janelli has been in the taxidermy business for over 30 years and has lived and worked in New Jersey throughout that time. Mr. Janelli's business requires possession, import, export, transport, and processing in New Jersey of a range of species including leopard and lion. In the ordinary course of his business, Mr. Janelli preserves and prepares mounts of leopard and lion. This is a significant revenue stream for his business, and he anticipates losing a significant portion of his business income due to enactment and enforcement of S977, which purports to make a significant aspect of his business illegal. Mr. Janelli will also lose valued client relationships and potential clients and suffer competitive injury in the taxidermy industry, as he will not be able to work on, receive, or export Big Four species lawfully imported into the United States and will be precluded from competing or participating in nationwide competitions that may include lion or leopard. These are all important parts of Mr. Janelli's business, and there is no workaround for the blanket ban of S977. Mr. Janelli is a member of Plaintiff Garden State Taxidermist Association and Past President of the National Taxidermy Association (among other memberships).

25. Plaintiff Garden State Taxidermist Association ("GSTA") is a membership-based non-profit corporation and trade organization for taxidermists in New Jersey. GSTA's mission is to

improve the profession, provide educational opportunities for members, and promote wildlife conservation.  GSTA's members' businesses include preserving traditional Big Four trophies as taxidermists.  Its members import, possess, process, transport, and sometimes export parts of the Big Four in the ordinary course of business.  Both the GSTA and its members will lose revenue and their image will be tarnished by the misguided laws at issue.

26. Conservation Force has standing on its own behalf and on behalf of its member-supporters, including hunters and taxidermists residing in New Jersey and businesses providing services to New Jersey residents wishing to possess, import, export, and transport Big Four trophies.  Such activities are prohibited by S977.  Each individual Plaintiff has standing as a New Jersey resident hunter, association, or business, or a business servicing New Jersey hunters, whose interests in possessing, importing, exporting, and transporting Big Four trophies are critically impaired by the enforcement of S977.

27. Conservation Force and its member-supporters possess sufficient interests in the subject of this action to establish standing.  They each possess concrete, particularized interests in promoting the principle and practice of sustainable use-based "conservation hunting" (*i.e.,* hunting designed by the foremost wildlife specialists to enhance, recover, and forever secure the species at issue).  Enforcement of S977 injures these interests by degrading and banning the symbols of tourist safari hunting success (*i.e.,* trophies).  It eliminates a New Jersey hunter's ability to import and preserve the traditional trophy of a Big Four hunt, reducing the demand for and revenues generated by this primary conservation tool.  Hunting revenues provide most of the funding for protection of habitat, operation of wildlife authorities, anti-poaching, and community projects and participation.  If the number of licensed, regulated safari hunters declines because they are discouraged and denied by bans like S977, less revenue and justification for conserving

12

habitat are available.  This injures not only Conservation Force and its member-supporters', but also essential conservation programs of range nations, that Conservation Force and its members depend upon.

28. Conservation Force's members in New Jersey, including the individual Plaintiffs, possess concrete, particularized interests in their right to import and possess the lawfully-acquired trophies of successful Big Four hunts.  Mr. Viden possesses a concrete, particularized interest in supplying big game hunters with the equipment needed for a successful hunt.

29. GSTA and Mr. Janelli possess concrete, particularized interests in possessing, importing, and processing traditional trophies of Big Four species, artistically preserving them, and exporting or transporting them to the hunter.  S977 destroys these interests by making them illegal.  It destroys the business interests of taxidermists, which is a unique business and requires natural animal parts.

30. There is a causal relationship between enforcement of S977 and Plaintiffs' injured interests.  The law makes unlawful in the state an activity and conservation strategy that was lawful, and that remains lawful under federal ESA and CITES regulations and permits.   An Order that enjoins the enforcement of S977 and declares it void will redress Plaintiffs' injuries because possession, import, export, transport, or processing of Big Four parts will not be prohibited.  Plaintiffs may continue to participate in sustainable use-based hunting, continue to import their trophies, and continue to provide backbone funding for Big Four conservation.  New Jersey law will no longer conflict with and countermand federal law, regulations, and permits.

## B.  DEFENDANTS

31. Defendant Christopher Porrino is Acting Attorney General of New Jersey until confirmed, and is responsible for enforcing the challenged statute.

32. Defendant Bob Martin is Commissioner of the New Jersey Department of Environmental Protection, and is responsible for enforcing and implementing the challenged statute.

## LEGAL AND FACTUAL BACKGROUND

### A. FEDERAL LAW PREEMPTS CONFLICTING STATE LAW UNDER THE U.S. CONSTITUTION'S SUPREMACY CLAUSE AND THE ESA

33. The U.S. Constitution declares that the laws of the United States "shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.  State laws that conflict with federal laws are void. *E.g., Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001).  The Court's inherent equitable powers allow it to enjoin enforcement of state laws preempted under the Supremacy Clause. *E.g., Lewis v. Alexander*, 685 F.3d 325, 345-46 (3d Cir. 2012) (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983)).

34. 42 U.S.C. § 1983 provides that "every person who, under color of any statute … of any State … subjects, or causes to be subjected, any citizen of the United States … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

### B. THE FEDERAL GOVERNMENT CAREFULLY REGULATES IMPORT, EXPORT, TRANSPORT, AND SUBSEQUENT POSSESSION OF SPORT-HUNTED TROPHIES

35. Under federal law and CITES, it is legal to possess, import, export, and transport traditional trophies, even those of "endangered" and "threatened" species, as long as the appropriate permits are issued.

36. Section 4 of the ESA requires the Secretary of Interior (the "Secretary," or her designee, the USFWS) to "list" species as "endangered" or "threatened."  16 U.S.C. § 1533(a)-(c).  For domestic species listed as endangered, the Secretary must designate "critical habitat" and develop

a "recovery plan." *Id.* & (f). The Secretary has no such jurisdiction over foreign listed species. Conservation of foreign species must, of necessity, be accomplished by foreign governments. The ESA requires the USFWS to take that into consideration in listing foreign species and to support range nations' programs (contrary to the actions of New Jersey). 16 U.S.C. §§ 1533(b)(1)(A) & 1537.

37. An "endangered species" means "in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). Leopard and lion populations ***not*** from Southern and Eastern Africa and all black rhino populations are endangered-listed. 50 C.F.R. § 17.11. Black rhino may be imported pursuant to a federal enhancement permit.[9]

38. A "threatened species" is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). African elephant and leopard and lion from Southern and Eastern Africa are threatened-listed. Southern white rhino populations are threatened-listed but only because of their "similarity of appearance" to other listed species. 50 C.F.R. § 17.11; 79 Fed. Reg. 28847 (May 20, 2014).

39. Section 9 of the ESA prohibits certain acts for endangered-listed species but defers to § 10, which authorizes the Secretary to "permit, under such terms and conditions as he shall prescribe—(A) any act otherwise prohibited … to enhance the propagation or survival of the affected species." 16 U.S.C. §§ 1538, 1539(a)(1). Neither Sections 9 nor 10 directly refer to threatened-listed species. Section 4(d) empowers the Secretary to "issue such regulations as he deems necessary and advisable to provide for the conservation of [threatened] species…" *Id.* § 1533(d). The USFWS issues select import permits for threatened listed elephant, leopard, lion

---

[9]     USFWS, *Enhancement Finding for Import of a Sport-Hunted Black Rhino Trophy Taken in Namibia During 2013* (Apr. 6, 2015).

and white rhino under these regulations. Defendants' two laws directly conflict with that conservation activity.

40. The USFWS has published extensive permit regulations for ESA listed species. *E.g.,* 50 C.F.R. §§ 17.1, 17.22, 17.31, 17.32, 17.40. It has explained the regulations and permits as follows:

> Under the ESA, otherwise prohibited activities, including import, export, take, and interstate or foreign commerce, may be permitted if the Service finds that the activity will enhance the propagation or survival of the affected species and is found to be consistent with the purpose of the law. [For example,] The Service has found that the import of trophies of bontebok, an endangered antelope from South Africa, as well as African elephants and leopards – both threatened species – can benefit those species by supporting the overall species management programs established within the species' naïve range. As a result, the Service has issued import permits for these species.

USFWS, *Frequently Asked Questions, Straight-Horned Markhor* (2014).

41. The Big Four are also listed species under CITES. CITES (the "Washington Convention") is an international agreement of 182 Parties intended to ensure international trade in specimens of animals and plants does not threaten their survival. The United States was the first Party, signing on in January 1974, at almost the same time the ESA was enacted. The ESA was drafted with an eye towards implementing CITES. One of the ESA's prime purposes is "to take such steps as may be appropriate to achieve the purposes of" CITES. 16 U.S.C. § 1531(b); 1976 U.N.T.S. 224, 27 U.S.T. 1087 (Mar. 3, 1973).

42. CITES specifically authorizes export and import of trophies of species taken in licensed, regulated hunts as part of the nation's conservation strategy for the species listed on Appendix I and Appendix II. Conf. Res. 2.11.

43. Under CITES, the Secretary of Interior, who has designated the USFWS, functions as the Management and Scientific Authorities for import permitting of foreign, CITES-listed species.

44. Under CITES, the findings and policy are that "peoples and states are and should be the best protectors of their own wild fauna and flora and international cooperation is essential…" The laws at issue conflict with both policies and the USFWS' implementation of those preambular facts and policy.

45. Appendix I includes: African elephant from Tanzania and Zambia; leopard (and the CITES Parties adopted quotas for leopard to facilitate that trophy trade as a conservation tool from the relevant countries, Conf. Res. 10.14 (CoP 16)); and black rhino.[10]

46. Elephant hunting trophies from Botswana, Namibia, South Africa, and Zimbabwe have been down-listed to Appendix II with a specific annotation to facilitate hunting trophy trade to the United States.[11]

47. White rhino hunting trophies from South Africa and Swaziland have been down-listed to Appendix II to facilitate trophy trade to the United States, which is the largest market for all of the Big Four.[12]

48. African lion from Southern and Eastern Africa are on Appendix II of CITES.  The USFWS only recently listed them as threatened, with an ESA "enhancement" import permit

---

[10]   CITES Parties typically set national export "quotas" for listed species.  Conf. Res. 14.7.  Quotas are limits on the number of animals that may be legally exported in a year.  They establish the upper limit of export "at a level that has no detrimental effect on the population of the species."  *Id.*  The Conference of Parties ("CoP") to CITES, the meeting of all member states, also sets quotas for certain Appendix I species which expressly authorize export and import.  *See* Conf. Res. 10.14 & 13.5 as examples.  These Resolutions were adopted to facilitate trade in hunting trophies because the CoP recognizes the beneficial role that hunting can play in a country's conservation program.  *E.g.*, "financial benefits derived from trophy hunting of a limited number of specimens will benefit the conservation of the species directly and provide additional incentives for conservation and habitat protection, when such hunting is done within the framework of national conservation and management plans and programmes."  Conf. Res 13.5.  Licensed and regulated hunting and subsequent trade is expressly favored by the CITES Parties – not prohibited.

[11]   *See* CITES, *Appendix II Annotation 6(a)*, https://cites.org/eng/app/appendices.php#6  ("Populations of Botswana, Namibia, South Africa and Zimbabwe (listed in Appendix II): For the exclusive purpose of allowing: a) trade in hunting trophies for non-commercial purposes").

[12]   *See* CITES, *Appendix II Listing*, https://cites.org/eng/app/appendices.php ("For the exclusive purpose of allowing international trade in … hunting trophies.").

requirement.  The New Jersey law will deprive those lion of the "enhancement" that the country programs and planning provide.

49. Import and export of Appendix I species are authorized when the country of import issues a permit and the country of export issues a permit, only after each country's Scientific Authority makes a non-detriment determination.  CITES art. III(2); 50 C.F.R. §§ 23.35, 23.36.  The country of export must also find the specimen was not obtained in contravention of its wildlife laws.  *Id.* Import and export of Appendix II species are authorized when the country of export issues a permit after making the appropriate non-detriment and non-contravention findings.  CITES art. IV(2)(a)-(b); 50 C.F.R. §§ 23.35, 23.36.

50. The USFWS has published regulations for CITES permits.  *E.g.,* 50 C.F.R. §§ 23.35, 23.36, 23.61, 23.74.  The USFWS regulates listed species under the ESA or CITES or both.  It issues one import permit as applicable, under the ESA or under CITES.

51. USFWS regulations are more stringent than CITES requirements.  A positive enhancement finding requires documentation of a national action plan for the species, population estimates, and science-based hunting quotas.[13]  The incentive of range nations is greatly derived from the need to establish trophy imports of the Big Four into the U.S.

52. Under the ESA and implementing regulations, the USFWS implements CITES. Violation of CITES is a violation of the ESA.  16 U.S.C. § 1538(c).  The Big Four are regulated by CITES quotas, which authorize a limited, sustainable level of export, just as they are regulated by USFWS, which authorizes and supervises imports.  CITES permits the same trade of the Big Four that New Jersey prohibits, which is contrary to USFWS regulations and permits.

53. Congress has enacted special laws as amendments or adjuncts to the ESA which are implemented by the USFWS and which expressly recognize the value of importing elephant and

---

[13]  *See, e.g.,* USFWS, Final Rule, *Listing Two Lion Subspecies*, 80 Fed. Reg. 80000, 80016, 80046 (Dec. 23, 2015).

white rhino hunting trophies.  *E.g.*, African Elephant Conservation Act, 16 U.S.C. §§ 4201-4245 (the "AECA"); Rhino and Tiger Conservation Act of 1994, *id.* §§ 5301-5306.  These statutes add to the general authority of the USFWS to allow the import of elephant and rhino trophies because of the conservation value of the underlying safari hunting.  For instance, according to the AECA, "there is no evidence that sport hunting is contributing to the illegal trade of Africa elephant ivory, there is evidence that well-managed elephant populations provide an important source of funding for African elephant conservation programs."  *Id.* § 4202; *see also id.* §§ 4223-4245 ("except for sport-hunted trophies, it is illegal to import…").

## C. THE ESA PREEMPTS STATE LAWS THAT PROHIBIT ACTIONS PERMITTED BY THE USFWS

54. The ESA, CITES, and the USFWS regulations implementing both create a comprehensive system which authorizes the possession, import, export, and transport, among other things, of listed species including the Big Four.  Under the ESA and CITES, the USFWS is fully engaged in issuance of import permits for elephant, leopard, lion, and rhino traditional trophies.  It is a rather large and equally important program of the USFWS.  The USFWS has published regulations for each species and now requires import permits for all of the Big Four.[14]

55. Under § 10 and its regulations, the USFWS only allows imports of Big Four trophies after it finds the underlying conservation and management program enhances the survival of the species.  The USFWS bases its finding on an expert analysis of the best available information related to that program and species.  The finding is a scientific validation the licensed, regulated

---

[14]  USFWS, *Listing Two Lion Subspecies, Final Rule*, 80 Fed. Reg. 80000 (Dec. 23, 2015).  Applications for lion imports are pending, and Plaintiffs expect permits will be issued pursuant to the criteria in the Final Rule; USFWS, *Revision of the Section 4(d) Rule for the African Elephant, Final Rule*, 81 Fed. Reg. 36388 (June 6, 2016).

hunting program benefits the species.[15]   Of course, New Jersey's ban will deny those intended

benefits.

56. For example, in finding "enhancement" and authorizing import of a black rhino horn as a

sport-hunted trophy, the USFWS concluded:

> Based on the success of implementing the Black Rhino Conservation Strategy for
> Namibia, the use of funds generated from black rhino hunts, and the biological
> need for such harvests … the import of this sport-hunted black rhinoceros from
> Namibia, taken as part of the national strategy and under the selection criteria
> established for culling, meets the criteria for issuing an import permit under the
> ESA.

USFWS, *Enhancement Finding for Import of a Sport-Hunted Black Rhino Trophy Taken in*

*Namibia During 2013* (Apr. 6, 2015).  The USFWS concluded that Namibia has "a mechanism to

ensure the revenue generated from the sale of hunts is used towards wildlife and community

conservation … This approach provides local communities with a stake in securing the continued

existence of rhinos and other wildlife," and "funds generated from sport-hunting will be used to

further conservation efforts and increase anti-poaching operations in country."  *Id.*[16]

57. Likewise, when it issued a finding for import of Zambian elephant, the USFWS

concluded:

> The previous ban on safari hunting in Zambia impact[ed] ZAWA's ability to
> manage wildlife resources due to decreased revenue from hunting fees.  In 2002,
> the ban on safari hunting was lifted and ZAWA began to implement a system of
> local community participation in wildlife management … This system allowed for
> the sharing of hunting revenues between ZAWA and local communities within
> these [Game Management Areas], giving communities a vested interest in
> conserving and protecting their wildlife resources … a clear indication of the
> benefits derived from sport hunting in relation to Zambia's elephants can be
> determined.  Based on these factors, DMA **is able to find** that the sport hunting of

---

[15]   *E.g., id.*; *see also* USFWS, *Importing Your Leopard or African Elephant Trophy* (Apr. 2014),
www.fws.gov/international/pdf/factsheet-import-leopard-elephant-sport-hunted-trophy-2013.pdf.

[16]   *See also* USFWS, *Press Release, Service Announces Decisions on Import of Sport-Hunted Trophies to Further
Conservation of Rhinos and Elephants, Authorizes Imports with Clear Conservation Benefits* (Mar. 26, 2015).

elephants in Zambia in 2011 and the subsequent importation of personal trophies is likely to enhance the survival of the species.

USFWS, *Enhancement Finding for African Elephants Taken as Sport-Hunted Trophies in Zambia during the 2011 Hunting Season* (Oct. 3, 2011) (original emphasis).

58. The USFWS uses the enhancement permitting system as a means to ensure U.S. hunters are participating in "conservation programs that truly benefit the species … by providing economic incentives," such as those "that promote community-based conservation."[17]  Simply, the USFWS intentionally and completely regulates the import of certain species, including all the Big Four, as a conservation tool to advance the purposes of the ESA and CITES.

59. Section 6 of the ESA contains an express preemption clause that applies to state laws which purport to also regulate listed species.  Section 6(f) provides:

> (f) CONFLICTS BETWEEN FEDERAL AND STATE LAWS
>
> Any State law or regulation which applies with respect to the importation or exportation of, or interstate or foreign commerce in, endangered species or threatened species is void to the extent that it may effectively (1) permit what is prohibited by this chapter or by any regulation which implements this chapter, or (2) prohibit what is authorized pursuant to an exemption or permit provided for in this chapter or in any regulation which implements this chapter...

16 U.S.C. § 1535(f).

60. This ESA clause has long been recognized to preempt state laws prohibiting the possession, import, or export of animal parts and products authorized by federal regulation or permit.

61. The USFWS recently acknowledged the preemptive effect of the clause in responding to a comment to the new elephant permit requirement:

---

[17]   USFWS, FAQs, *Straight-Horned Markhor* (2014), https://www.fws.gov/home/feature/2014/pdf/MarkhorFAQs-fRuleFinal.pdf.

The ESA generally preempts a State law that applies to import or export, or interstate or foreign sale of endangered species, where the State law prohibits what is authorized pursuant to an ESA exemption, permit, or implementing regulation.

USFWS, *Final Rule*, 81 Fed. Reg. 36388, 36399 (June 6, 2016).

62. The supremacy of federal environmental regulation predates the express ESA provision and dates back to preemption of waterfowl regulations under the Migratory Bird Treaty Act. *Missouri v. Holland*, 252 U.S. 416 (1920).

63. Under the ESA § 6(f), a state law that purports to prohibit what the USFWS allows is void.

### D. NEW JERSEY'S TWO BANS ON BIG FOUR TROPHIES VIOLATE ESA § 6 AND ARE VOID AS PREEMPTED.

64. Ignoring the comprehensive regulations and the USFWS' use of enhancement permits as a conservation incentive, the New Jersey Legislature – claiming no special expertise in assessing the benefits of sustainable use – enacted two laws prohibiting possession, import, export, transport and more of Big Four species from conservation-based hunting programs found by USFWS to benefit the species.

65. On February 4, 2016, identical bills (S977 and A4773) were introduced in the New Jersey Senate and Assembly to prohibit the possession, import, export, and transport, among other things, of the parts of the Big Five. On the same day, identical bills (S978 and A2510) were introduced into the Senate and Assembly to prohibit the possession, import, export, and transport of the Big Five at airports and ports owned or operated by the Port Authority of New York and New Jersey (the "PANYNJ").[18]

---

[18] Please see Exhibits 1 and 2 for the text of each bill as introduced, the history of each, and the enacted copies.

66. The primary sponsor and author of the bills, State Senator Ray Lesniak, openly admits that the bills are intended to "end trophy hunting," and posted a petition and website to advance this goal.[19]  His public statements related to the bills equate licensed, regulated hunters with poachers.[20]

67. On February 11, 2016, the Senate unanimously passed S977 and S978.  On March 14, the Assembly passed each of these bills, which were sent to Governor Christie for signature.

68. Concerned by the bills' broad scope, potential injury to New Jersey hunters and businesses, and significant damage to Big Five conservation in range nations and the hunting industry in Africa and the United States, Conservation Force sent a letter to Governor Christie.[21]

69. In the letter, Conservation Force explained the importance of licensed, regulated hunting to the conservation paradigm of Southern and Eastern Africa.  Conservation Force described the essential benefits hunting generates and absence of any comparable source of funds, anti-poaching, and community incentives.

70. As the letter described, in one example, a recent study concluded that if licensed, regulated hunting revenues were eliminated in Namibia, 80% of Namibia's communal conservancies would have to close and ~50,000 km$^2$ of habitat would be at risk of conversion to

---

[19]  Sen. R. Lesniak, Website, *End Trophy Hunting*, http://raymondlesniak.com/endtrophyhunting/; Sen. R. Lesniak, Facebook Page and Posts, https://www.facebook.com/SenatorLesniak.

[20]  *See, e.g.,* "Every year hundreds of hunters from North America and Europe travel to Africa to participate in what are known as 'big-game' hunts for exotic and dangerous animals … occasionally these hunters from North America or Europe engage in the illegal poaching of these animals and attempt to bring their 'trophies' back with them when they return from their trips."  Sen. R. Lesniak, Press Release, *Lesniak Bill Would Ban 'Trophy Animals' in NJ* (Jan. 7, 2016), http://politickernj.com/2016/01/lesniak-bill-would-ban-trophy-animals-in-nj/; Sen. R. Lesniak, Facebook, *National Animal Rights & Preservation Groups to Join Lesniak to Mark Final Approval of Landmark Animal Trophy Ban*; *Lesniak's Ban on 'Trophy Animals' Enacted into Law* (June 2, 2016), http://njtoday.net/2016/06/02/lesniaks-ban-trophy-animals-enacted-law/.

Contrary to Senator Lesniak's suggestions, legal hunting is licensed and regulated by range nation wildlife authorities and through USFWS import permitting.  Poaching, by definition, is illegal.  Legal hunting provides the largest source of *anti*-poaching.

[21]  The letter was sent April 20, 2016, and it, including its attachments, is attached and incorporated as Exhibit 3.

23

other uses.  Conservation Force provided several additional specific examples, including one from the IUCN, "the world's largest and most diverse environmental network," which provides ten case studies and almost three pages of references supporting licensed, regulated hunting as a conservation tool.[22]

71. Conservation Force attached a sampling of academic papers, government statements, and articles demonstrating that licensed, regulated hunting is the largest source of funding for wildlife authorities, anti-poaching, community projects, and habitat protection.

72. Conservation Force also made the Governor aware that S977 and S978 are void under the ESA's "Conflicts between Federal and State Laws" provision, 16 U.S.C. § 1535(f).

73. On May 2, 2016, Governor Christie vetoed S977 and S978, but sent back to the legislature the conditions upon which he would sign the bills.  The conditions included, among other things:

    a.  Removing the Cape buffalo from the list of protected species;

    b.  Removing the requirement that a person possessing a Big Four part prior to the law's effective date obtain a "certificate of possession" from the New Jersey Department of Environmental Protection ("grandfathering" pre-enactment trophies without additional paperwork for the owners);

    c.  Removing the bills' references to the International Union for Conservation of Nature's *Red List*, a report periodically released by a non-governmental organization that assesses the status of at-risk wildlife;

    d.  Removing a reference to threatened-listed species in the definition of "endangered species"; and

    e.  Including an exception in each bill to allow passage through the state of Big Four parts imported from and destined for a final location outside New Jersey.

74. In his conditional veto, the Governor acknowledged that S977 and S978, "in essence, seek to discourage big game hunting overseas by prohibiting the trophies from those hunts from

---

[22]   IUCN, Briefing Paper, *Informing Decisions on Trophy Hunting* (April 2016), http://cmsdata.iucn.org/downloads/iucn_informingdecisionsontrophyhuntingv1.pdf.

24

entering New Jersey," but admitted that "[t]here are significant questions whether such bans help or actually hurt wildlife conservation."[23]

75. On May 9, 2016, the Senate unanimously concurred with the Governor's recommendations for the bills. On May 26, it unanimously passed both bills. On the same day, the Assembly accepted the Governor's recommendations and passed both bills.

76. Governor Christie signed both bills on June 1, 2016. S977 became effective immediately, but S978 does not become effective until the State of New York, which shares authority for the PANYNJ, enacts a similar bill.

77. The newly enacted S977, now P.L. 2016, Chapter 6, provides in pertinent part:

a.  Notwithstanding the provisions of section 6 of P.L. 1973, c. 309 (C.23:2A-6) or any other law, or any rule or regulation adopted pursuant thereto, to the contrary, no person shall possess, transport, import, export, process, sell or offer for sale, or ship, and no common or contract carrier shall knowingly transport or receive for shipment any part or product of: (1) any specified African species; or (2) any species or subspecies of elephant, rhinoceros, tiger, lion, leopard, cheetah, pangolin, marine turtle, or ray listed in Appendix I or Appendix II of the Convention on International Trade in Endangered Species of Wild Fauna and Flora. …

78. "Specified African species" are defined to include the African elephant, leopard, lion, and black and white rhinoceros.

79. There is an exception for a part or product that

enters the State from another state or from a point outside the territorial limits of the United States, and is transported across the State destined for a point beyond the State … in accordance with the terms of any federal permit or permit issued under the laws or regulations of another state.

80. The penalties for violation of the law include, but are not limited to, a $200-$1,000 fine for a first offense and a $500-$3,000 fine for each subsequent offense.

---

[23]   Gov. C. Christie, *Conditional Veto* (May 2, 2016) (attached as part of Exhibits 1 and 2); http://www.njleg.state.nj.us/2016/Bills/S1000/977_V1.PDF.

81. The newly enacted S978, now Public Law 2016, Chapter 7, provides in pertinent part:

b.  Notwithstanding the provisions of any other law to the contrary, the parts or products of priority species shall not be imported, exported, shipped, received, possessed, processed, sold, offered for sale, or transported by any individual, firm, corporation, association, or partnership at any airport or port facility owned or operated by the Port Authority of New York and New Jersey…[24]

82. "Priority species" are defined to include "specified African species," including the African elephant, leopard, lion, and black and white rhino.

83. There is an exception for when:

(5) the part or product entered the State of New Jersey or the State of New York from a point outside either state, including a point outside the territorial limits of the United States, was intended for transport across the State of New Jersey or the State of New York, but was destined for a point beyond the State of New Jersey or the State of New York, and the part or product conforms with the terms of any federal permit or permit issued under the laws or regulations of a state other than the State of New Jersey or the State of New York.

84. Under this law, "[a]ny Port Authority agent or Port Authority police officer shall have authority to enforce the prohibition … and, where necessary, to apply for and execute any warrant to search for and seize any part or product of a priority species…"

85. In addition to seizure, "[a] person who violates subsection b. of this section shall be guilty of a crime of the fourth degree."

86. In effect, these laws exempt non-residents with USFWS permits but prohibit possession, import, export, transport, etc. for residents and businesses servicing residents, even those with valid USFWS permits or acting pursuant to federal regulations.

---

[24]    The PANYNJ owns or operates JFK, LaGuardia, and Newark Liberty Airports; an air cargo facility; and the Port of New Jersey and New York, among other facilities.  PANYNJ, *Website*, http://www.panynj.gov/.

87. In sum, the laws ban the possession, import, export, and transport (among other things) of Big Four trophies by New Jersey residents and businesses and individuals and businesses doing business with Big Four hunters in New Jersey.

88. These laws were intended to, and they do, make licensed, regulated hunting of the Big Four more difficult and less attractive for New Jersey residents because the hunter cannot bring home a traditional trophy of the Big Four.

89. These laws do not except federally authorized or permitted imports of the Big Four intended to remain in the state.  A New Jersey resident with a valid USFWS import permit cannot continue to possess, import, or transport the permitted trophy in the state.

90. S977 and S978 ban the possession, import, export, and transport (among other things) of Big Four trophies authorized by § 10, federal regulations implementing the ESA and CITES, and USFWS enhancement findings and permits.   Because S977 and S978 "prohibit what is authorized pursuant to an exemption or permit provided for in this chapter or any regulation which implements this chapter," they are preempted, void, and unenforceable under the ESA.  16 U.S.C. § 1535(f).

91. S977 and S978 are also void under three public policies.

a. They undercut the ESA's purposes because they reduce funding and support for listed species and run counter to the express authorization of CITES.

b. They undercut the enhancement acknowledged by the ESA, federal regulations, and USFWS findings and permits.

c. They undercut the public policy of sustainable use, which is intended to generate operating revenue for wildlife authorities to fund anti-poaching, wildlife recovery, and wildlife management; to incentivize local people to tolerate or value listed species; and to preserve habitat, among other things.

92. For these reasons, S977 and S978 are preempted.  These laws also deprive Plaintiffs of the right and privilege to import the traditional trophies of Big Four species that enhance the survival of the species, as authorized by ESA § 10, USFWS regulations and permits, and CITES.

93. Plaintiffs challenge the enforcement of S977, which irreparably injures their interests and livelihoods.

## INJURIES TO PLAINTIFFS

94. Individual hunters, the hunting industry, related industries, and range nations conservation programs are all damaged by enactment and enforcement of S977.

95. The Big Four safari hunting seasons in a significant number of African range nations begin on July 1.  Enforcement will decrease demand and diminish the returns.  Plaintiffs' injuries from the reduced hunting are immediate, irreparable, and immeasurable.

96. Individual hunters who reside in New Jersey (such as Plaintiffs Viden, Hefferan, Dear, Spinella, and Nordling) are irreparably damaged from enforcement of S977 because they can no longer import or possess lawfully acquired personal property – their Big Four trophies.

97. Traditional trophies are the taxidermied or soon-to-be-taxidermied, identifiable parts of a game animal taken by a successful hunter in a licensed, regulated safari hunt.  They range from a set of antlers to a life-sized mount of the animal as in the wild.  It is a general ethic of safari hunters not to waste any part of the game animal.  The meat is generally eaten or provided to local people for consumption, and the skin, horns, tusks etc., are transported home as greatly valued personal property.  Traditional trophies memorialize a hunting experience and honor the game animal.  They also symbolize the hunter's victory against himself or herself and against the challenge of the hunt conditions (such as weather, dangerous game, physical toll, etc.).  Because of what they represent, trophies are among the hunter's most valued possessions.

28

98. In addition, safari hunters claim the trophies of Big Four species because if the legal hunters did not, illegal hunters would.  The valuable parts would be sold on the black market.  They would cause problems for the governments and law enforcement in range nations.  Legally taken trophies are far more secure in the United States, with the legal, properly permitted hunter.

99. S977 robs New Jersey hunters of their legal personal property, which they claim for many good reasons.  And while it may "grandfather" trophies already in a hunter's possession, it does not grandfather booked hunts.  The African hunting season varies by country, but is generally busiest July through October.  New Jersey hunters who already booked safaris this year are expecting (or expected) to leave soon.  But their Big Four trophies are now in limbo because hunters are banned from importing/possessing them in the state – although the parts were and remain legal under U.S. and international law.  In many instances, the hunters already have federal import permits.  They have spent countless hours and dollars planning and preparing for licensed, regulated, legal safaris.  Their plans are now destroyed by the state's action.  This damage is caused "under color of law" because state officials (Defendants) are required to implement and to enforce S977.  S977 deprives hunters of their vested statutory and regulatory rights and privileges to import Big Four trophies pursuant to ESA § 10, federal regulations, and federal permits.  The hunters are irreparably injured by enactment and enforcement of S977, and money damages will not make them whole because they stand to lose unique, irreplaceable, highly-valued personal property (traditional trophies); unique, personal hunting experiences; and the ability to engage in an activity that is a highly-valued part of their lives.

100. Similarly, if S978 goes into effect, it will damage hunters in New Jersey because it removes the closest airports and ports from use, even though New Jersey and New York are each

USFWS "designated ports."[25]   S978 also damages hunters outside New Jersey planning to ship through PANYNJ facilities due to the risk that PANYNJ officers will mistake their shipments for those not excepted under S977 and S978.

101. Hunting and related business in and outside of New Jersey are damaged because of reduced demand for safaris and safari equipment due to the inability to bring back traditional trophies, and reduced demand for shipping and taxidermy of the Big Four.   Shippers or taxidermists who accepted Big Four parts prior to S977's effective date face additional exposure if they hold hunting trophies belonging to others.   Their current possession may be "grandfathered," but the hunter has a claim on the animal parts.   The shipper or taxidermist may wish to return them but now cannot "transport, import, export, process … or ship" them.   The shipper or taxidermist is stuck and likely unpaid.   They are greatly and irreparably damaged by enactment and enforcement of these laws.   Neither the legal risk they face, nor the loss of opportunities to taxidermy Big Four parts, is compensable by money damages.

102. Under S977 New Jersey residents may no longer possess legally acquired Big Four trophies; hunters will cancel hunts and no longer book hunts for the Big Four.   For example, Plaintiffs Dear and Hefferan are each planning to hunt in Africa next year and are each considering cancellation as a result of S977.   But U.S. hunters are the largest source of conservation funding for African range nations.   They pay the most fees and often donate to recovery, anti-poaching, and villages on top of fees paid.   Cancellations and non-bookings mean reduced funding for wildlife authorities and anti-poaching, fewer hunters in the field as a deterrent, and reduced contributions to local communities, which will increase incentives to

---

[25]   USFWS, Office of Law Enforcement, *Designated Ports*, https://www.fws.gov/le/designated-ports.html.

retaliate against problem wildlife.[26]   Reduction of benefits, game meat, and salaries/gratuities from employment with safari operators will increase the financial need to poach, with detrimental effects on the Big Four.  Hunting revenues will decline, but offtakes will continue. Rather than "saving" wildlife, the laws diminish the benefits of sustainable use (benefits recognized by the USFWS, CITES, international conservation groups like the IUCN, and species and specific experts).  S977 will exacerbate loss of habitat, poaching, and human-wildlife conflicts for the Big Four.  This causes irreparable and extensive injuries to Plaintiffs, not compensable by money damages.

103. Plaintiffs are also irreparably injured because S977 and S978 are intended to reduce tourist safari hunting of the Big Four in range nations, and ignore USFWS import regulations and permits, which are intended to benefit the species through encouraging well-managed, sustainable hunting.  Conservation Force and its members, as well as the USFWS, use Big Four safari hunting as a tool for recovery and perpetuation of those species.  S977 and S978 threaten to reduce the effectiveness of this tool.

104. Reduced hunting will also reduce Conservation Force's funding and the support that comes from its hunter-supported conservation projects for the Big Four.

---

[26]    Contrary to the apparent views of the New Jersey Legislature, wildlife in Africa is considered by rural residents to be a nuisance and a threat.  Elephants damage crops and interfere with agricultural and other businesses. Leopards and especially lions attack livestock and even people.  *See, e.g.,* M. Phillis, *NJ Bill Would Ban Some Hunting Trophy Imports*, Reuters (July 30, 2015), http://www.phillyvoice.com/new-jersey-bill-ban-lion-imports; N. Onishi, *A Hunting Ban Saps a Village's Livelihood*, New York Times (Sept. 12, 2015), http://www.nytimes.com/ 2015/09/13/world/a-hunting-ban-saps-a-villages-livelihood.html; *Marauding Elephants Kill One Person, Destroy Crops in North Tanzania*, Minggu (June 19, 2016), http://www.antaranews.com/en/news/105290/marauding-elephants-kill-one-person-destroy-crops-in-north-tanzania; B. Keakabetse, *Communities in Ngamiland Have Given Government Ultimatum to Partially Lift the Hunting Ban* (June 24, 2016), http://www.mmegi.bw/index.php?aid=61044&dir=2016/june/24.

## CLAIMS FOR RELIEF

### COUNT I
### PREEMPTION UNDER THE SUPREMACY CLAUSE

105.  Plaintiffs re-incorporate and re-allege the preceding paragraphs.

106.  ESA § 10 and federal regulations allow import and subsequent possession of the Big Four as traditional hunting trophies.  For elephant, leopard, lion, and rhino, import is allowed only after the USFWS finds the underlying management program enhances the survival of the species. This is validation that licensed, regulated hunting benefits the species and explicit "authorization pursuant to an exemption or permit" and ESA and CITES implementing regulations.

107.  ESA § 6 "void[s]" any state law that "prohibit[s] what is authorized pursuant to an exemption or permit" under the ESA or "any regulation which implements" the ESA.

108.  S977 bans the possession, import, export, and transport (among other things) of Big Four parts and traditional trophies, even when the activity is authorized by a federal permit or regulation.  S977 is void under § 6 and the Supremacy Clause of the U.S. Constitution.

109.  S977 is preempted and void under the public policy and purposes of the ESA, CITES, and implementing federal regulations.

110.  S977 should be declared void as pre-empted, and a preliminary and permanent injunction should issue against its enforcement.

111.  These remedies will redress the irreparable injuries caused by enactment and enforcement of S977 described above.

### COUNT II
### VIOLATION OF 42 U.S.C. § 1983

112.  Plaintiffs re-incorporate and re-allege the preceding paragraphs.

113.  Defendants are New Jersey officials acting under color of S977, a state law.

114.  Plaintiffs (hunters, representatives of hunters, and taxidermists) have rights and privileges authorizing the import of Big Four trophies under ESA § 10, CITES, USFWS regulations (*e.g.,* 50 C.F.R. §§ 17.22 & 23.35), USFWS and CITES import permits, and USFWS enhancement findings.

115.  S977 deprives Plaintiffs of their rights and privileges by banning possession, import, export, transport, etc. of Big Four trophies, even though those trophies are lawful and federally permitted.

116.  Under color of S977, Defendants are depriving Plaintiffs and the members of Conservation Force and GSTA of rights and privileges secured by the ESA, CITES, and federal regulations and permits.  Defendants are therefore liable for violating 42 U.S.C. § 1983, and their unlawful conduct may be enjoined.

117.  These remedies will redress the irreparable injuries caused by enactment and enforcement of S977 described above.

### REQUEST FOR RELIEF

For the above reasons, Plaintiffs respectfully request the Court enter judgment providing the following relief:

1.  Declare that S977 is preempted and void under § 6(f) of the ESA and the Supremacy Clause of the U.S. Constitution;

2.  Declare that S977 is preempted and void as against public policy;

3.  Declare that S977 deprives Plaintiffs of their rights and privileges to import trophies under ESA § 10, CITES, USFWS regulations, USFWS-issued permit, and USFWS enhancement findings;

4. Issue a preliminary and permanent injunction to stop the New Jersey Attorney General and the Department of Environmental Protection from enforcing S977;

5. Award Plaintiffs their reasonable attorneys' fees and costs as allowed by law, including 42 U.S.C. § 1988; and

6. Award Plaintiffs such other relief the Court deems just and proper.

Date: July 7, 2016                           Respectfully submitted,

                                             _s/ Brendan Judge_
                                             Brendan Judge
                                             Bar No. 021561991
                                             CONNELL FOLEY LLP
                                             85 Livingston Avenue
                                             Roseland, New Jersey 07068
                                             bjudge@connellfoley.com
                                             (973) 535-0500 (tel.)
                                             (973) 535-9217 (fax)

                                             John J. Jackson, III
                                             D.C. Bar No. 432019
                                             CONSERVATION FORCE
                                             3240 S. I-10 Service Road W., Suite 200
                                             Metairie, Louisiana 70001
                                             cf@conservationforce.org
                                             (504) 837-1233 (tel.)
                                             (504) 837-1145 (fax)
                                             *Application for admission pro hac vice pending*

                                             *Attorneys for Plaintiffs*

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that to my knowledge the matter in controversy is not related to any pending matter or controversy.

*s/ Brendan Judge*
Brendan Judge

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 201.1

I hereby certify that the above-captioned matter is not subject to compulsory arbitration because Plaintiffs seek injunctive relief.

*s/ Brendan Judge*
Brendan Judge

Dated: July 8, 2016

3757495-1